People of the State of Illinois, etc. v. Roseland State Savings Bank.

Fannie Shackter et al., Executors of Estate of Simon Cohen, Deceased, Appellants, v. Otto C. Woerter, Receiver of Roseland State Savings Bank, Appellee.

Gen. No. 42,353.

Opinion filed April 20, 1943. Rehearing denied May 4, 1943.

SEYMOUR N. COHEN, of Chicago, for appellants.

HERBERT G. IMMENHAUSEN, of Chicago, for appellee; MILTON SMITH, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Simon Cohen filed an intervening petition in a proceeding pending in the circuit court for the liquidation of the Roseland State Savings Bank, asking that the amount of his indebtedness to the bank be ascertained, that certain securities held by the receiver be turned over to him, and for other relief. The receiver filed his answer and the matter was referred to a master in chancery, who, pursuant to a full hearing, ascertained and found that petitioner was indebted to the receiver in the amount of $2,213.62, and recommended, *inter alia,* that upon payment of that sum the receiver deliver to petitioner the securities in question, and that he be enjoined from enforcing the payment of a judgment for some $8,000 entered in favor of the receiver and against petitioner in the municipal court. On hearing of exceptions to the master's report, the chancellor by decree approved the report in all re-

spects except the recommendation that petitioner was entitled to the securities. Petitioner died before the entry of the decree and his executors appeal from that portion of the decree which found that he had never acquired any right, title or interest in and to the collateral and that his executors were therefore not entitled thereto.

From the uncontroverted testimony taken by the master it appears that when the petition was filed Simon Cohen was 79 years old, blind and therefore unable to read. Some time prior to the closing of the bank Emil Seip and Walter C. Schmitt, directors and officials of the bank, requested him to call at the bank with respect to an account of his son Samuel, who they said was indebted to the bank upon two notes aggregating $19,000. They told him that the bank held as collateral security for these notes certain shares of stock theretofore deposited by the son, and because of the depreciation of the stock in value they requested him to act as surety on the notes for the son's indebtedness. Cohen testified that the bank officials assured him the collateral would continue to be held as security for the two notes and that he signed them jointly with his son, because of these representations. Some months later when the notes matured and the indebtedness had been reduced by payments to $17,500, he was again called to the bank by the same officials and requested to act as surety for the balance of the debt. He was again assured that the stock was being held as collateral security for the indebtedness, and pursuant to these representations he signed the renewal note with his son in the principal amount of $17,500. It appears that at the time he assumed these obligations his son was indebted to the bank on notes in excess of $45,000 and that the stock in question had been deposited as collateral for one of those notes, but petitioner stated that he did not know nor was he advised of this fact. Shortly thereafter the bank was

closed by the auditor of public accounts and a receiver was appointed. Petitioner then learned for the first time that his son was obligated to the bank on other notes, that the stock in question had not been deposited as collateral for the note signed by him, but for another of his son's notes, and that the representations made to him by the bank officials were untrue.

When the bank went into liquidation petitioner was indebted to it upon two individual notes in the principal aggregate amount of $3,024.21, in addition to the joint note for $17,500. He then paid to the receiver the total sum of $6,971.15, received the two notes representing his individual indebtedness to the bank, and the balance of the payment was directed to be applied on the joint note for $17,500.

Negotiations for settlement resulted in a court order on July 29, 1932, wherein the receiver was directed to accept the amount of petitioner's indebtedness, as fixed by the order, in monthly instalments of $600, with interest at 5 per cent per annum. Following the entry of that order petitioner made monthly payments of $600 which he directed to be applied upon the joint note signed by him and his son in the principal amount of $17,500. These payments continued for approximately one year, and then finding that because of his depreciated income he was unable to continue the payments, he made an agreement with the receiver, without court order, to pay $300 a month until the indebtedness of $17,500, with interest, had been liquidated.

Through miscalculation petitioner was under the impression that he had paid his indebtedness to the receiver in full, whereas in fact there remained a balance of some $900 with interest, and accordingly he stopped making the monthly payments under his agreement with the receiver. Some time thereafter the receiver had judgment in the municipal court by confession against petitioner and his son for $8,382.74, the amount which the receiver claimed was the unpaid balance of

the $17,500 note. By appropriate proceedings petitioner had the judgment vacated as to him, and that proceeding is still pending. He then filed the petition here under consideration, asking that the amount of his individual indebtedness be ascertained, offering to pay any balance due, and asking that the collateral in question be turned over to him. The master found that petitioner was still indebted to the receiver in the sum of $910.06 in principal, and interest amounting to $1,303.56, or a total of $2,213.62, and he recommended that upon payment of this sum the collateral be delivered to him. After petitioner's death his executors paid the receiver the amount found to be due, and took a receipt evidencing that payment.

The only controverted question is whether the court erred in withholding the collateral from the executors, after petitioner's indebtedness had been satisfied in full. It is significant that petitioner's testimony before the master was uncontradicted and unimpeached. Schmitt died before the hearing, but Seip was available as a witness; nevertheless, no effort was made to produce him or to impeach or contradict anything to which petitioner had testified. If Cohen's testimony was true he was entitled to the collateral, since it is conceded to be the established rule, that upon payment of the principal debt by a surety, he is entitled in equity to be subrogated to the rights of the principal in any collateral deposited as security for the indebtedness. *Lochenmeyer v. Fogarty*, 112 Ill. 572; *Lawrence v. Hammond*, 208 Ill. App. 31; *Robbins v. Slavin*, 292 Ill. App. 479. But the chancellor, without assigning any reason, decided not to be guided by the testimony, nor by the recommendations of the master, and entered a decree contrary to the master's recommendations. Counsel for the executors said on oral argument, without denial, that the entire time taken in hearing exceptions to the master's report did not exceed 15 minutes, and that the chancellor reached his

conclusions without reading or examining any part of the transcript of testimony, which consists of 140 pages, or manifesting any desire to do so. The receiver seeks to justify this course of procedure by contending that a master's findings, although prima facie correct, are merely of an advisory nature and may be disregarded by the chancellor. We.have always understood it to be the rule that the master's province in the first instance is to determine the facts, and that although his findings do not carry the same weight as the verdict of a jury, nor of a chancellor where the witnesses have testified before him, nevertheless they are entitled to due weight on review, and the cases so hold. *Kcuper v. Mette,* 239 *Ill.* 586; *Mruk v. Mruk,* 379 Ill. 394. Of course the facts are found by the court as a basis for the decree, and it· is conceivable that the chancellor may disregard the testimony of a witness whose story is so unreasonable and improbable as to be unworthy of belief. However, such procedure presupposes that the chancellor has examined or is familiar with the transcript of the testimony, .and that there is other credible evidence upon which his findings may be predicated, but it cannot be invoked to disregard the uncontradicted testimony of a witness with which the chancellor is not familiar, as against the findings of a master who has heard all the testimony, who has had the advantage of seeing and hearing the witness and whose findings are predicated upon undisputed evidence. In *Larson v. Glos,* 235 Ill. 584, it was said that "a court or· jury is not bound to believe a witness when, from all the other evidence or from the inherent improbability or contradictions in the testimony, the court or jury is satisfied of its falsity; .(*Podolski v. Stone,* 186 Ill. 540) ; but a jury cannot willfully or from mere caprice disregard the testimony of an unimpeached witness. (*Chicago and Alton Railroad Co. v. Gretzner,* 46 Ill. 75.) Where the testimony of a witness is uncontradicted, either by positive testi-

mony or by circumstances, either intrinsic or extrinsic, and the witness is not impeached, the testimony cannot be rejected *even by a jury.*" (Italics ours.) In the recent case of *Mammina v. Homeland Ins. Co.,* 371 Ill. 555, the court said: "As there was no contradiction of appellant's testimony either by testimony or circumstances, and it is not inherently improbable, the court could not, without committing error, reject it. *Kelly v. Jones,* 290 Ill. 375; *Larson v. Glos,* 235 id. 584."

It is urged by the receiver, without any basis in fact, that "the testimony of a witness may contain within itself its own impeachment and he may be contradicted by what he states, as well as by adverse testimony," and the suggestion is offered, but not argued, that the chancellor was justified in disregarding Cohen's testimony as improbable. The circumstances under which he signed the note as surety for his son's indebtedness, do not justify any such conclusion. His individual indebtedness to the bank was of minor consequence, and he paid that to the receiver shortly after the bank was placed in liquidation. His son was more than 40 years of age, and petitioner was not obligated to assume his debts to the bank. It was only through ties of blood and for sentimental reasons that he undertook to do so. It is reasonable to assume that if the bank officials had apprised him of his son's total indebtedness, which exceeded $45,000, he would have hesitated to make himself personally liable for payment of so large a debt. According to the undisputed testimony, his willingness to sign the note was induced by the withholding of important facts with respect to his son's debts, and the representations of the bank officials that the collateral on deposit would continue to be held as security for payment of the $17,500 note. Petitioner manifested his integrity by paying his individual indebtedness, as well as the entire sum of $17,500 with interest, in accordance with his undertaking. These facts would not justify the court in con-

cluding that his testimony was unworthy of belief or that his story was improbable.

For the reasons indicated that portion of the decree from which the appeal is taken is reversed and the cause remanded with directions to enter a decree in accordance with the findings and recommendations of the master.

*That portion of the decree appealed from reversed and the cause remanded with directions.*

SULLIVAN, P. J., and SCANLAN, J., concur.